## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

GEORGE MANN,

      Plaintiff,

vs.

FIFTH THIRD BANK, *et al.*,

      Defendants.

Case No. 1:09-cv-014
(consolidated with Case No. 1:09-cv-476)

Judge Timothy S. Black

## ORDER THAT DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Doc. 41) IS GRANTED

This civil action is before the Court on Plaintiff's motion for summary judgment (Doc. 41) and the parties' responsive memoranda (Docs. 54, 57).

### I.  BACKGROUND

Defendants, Fifth Third Bancorp, Fifth Third Bank, and David Haas, move for summary judgment dismissing Plaintiff George Mann's complaint in its entirety. This case grew out of the termination of Plaintiff's employment by Defendants. Plaintiff was a Vice President heading the Real Estate Valuation Group ("REVG") at Fifth Third Bank ("Fifth Third" or "Bank"). Defendants maintain that Plaintiff was fired for sending unprofessional emails and engaging in retaliatory conduct toward a subordinate. Plaintiff alleges that he was in fact terminated for reporting alleged violations by the Bank to his superiors and the Bank's regulators.

Plaintiff has sued for violations of the Financial Institutions Reform Recovery and Enforcement Act ("FIRREA"), the Sarbanes-Oxley Act ("SOX"), and under Ohio common law for wrongful termination of employment in violation of public policy.

Defendants have moved for summary judgment.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).[1] The moving party has the initial burden of showing, by identifying specific evidence, that there exists no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); Fed. R. Civ. P. 56(c)(2). When the movant meets this burden, it is then the opposing party's duty to "set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *see also* Fed. R. Civ. P. 56(c)(2). "Genuine" is the operative word; the party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The "opposing party may not rely merely on allegations or denials in its own pleading;" rather it must identify specific facts together with supporting evidence that establish a genuine issue for trial. Fed. R. Civ. P. 56(e)(2).

---

[1] Amendments to Rule 56 went into effect on December 1, 2010. This Motion was filed on November 15, 2010. Therefore, the pre-amendment Rule controls in this case.

"Weighing of the evidence or making credibility determinations are prohibited at summary judgment  -  rather, all facts must be viewed in the light most favorable to the non-moving party." *Keweenaw Bay Indian Comm. v. Rising*, 477 F.3d 881, 886 (6th Cir. 2007).  A court's obligation at the summary judgment stage is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

## III.  ANALYSIS

### A.  Plaintiff's retaliation claim under FIRREA

#### 1.  Elements

In his first cause of action, Plaintiff alleges that Defendants[2] terminated his employment in retaliation for "whistleblowing" in violation of FIRREA, 12 U.S.C. § 1831j.  The relevant statute provides:

> No insured depository institution may discharge or otherwise discriminate against any employee with respect to compensation, terms, conditions, or privileges of employment because the employee (or any person acting pursuant to the request of the employee) provided information to any Federal Banking agency or to the Attorney General regarding -

---

[2] As shown in the subsequent quotation from the statute, a private right of action for retaliation under FIRREA can only be made against various institutional entities, including an "insured depository institution." The remedies provided in the statute permit a court to "order the depository institution . . . which committed the violation" to make an employee whole. 12 U.S.C. § 1831j(c). While Plaintiff's initial Complaint, which contained the FIRREA claim, was only directed at Fifth Third Bank as the Defendant, the case was later consolidated with a second Complaint that listed Haas, individually, as a Defendant. To be clear, then, Plaintiff's claim under FIRREA is only against Fifth Third Bank and Fifth Third Bancorp. The Court grants summary judgment as to any such claim directed at Defendant Haas.

> (A) a possible violation of any law or regulation; or
>
> (B) gross mismanagement, gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety;
>
> by the depository institution or any director, officer, or employee of the institution.

12 U.S.C. § 1831j(a)(1). FIRREA adopted the legal burdens of proof the Whistleblower

Protection Act ("WPA"), 5 U.S.C. § 1221(e)(1). 12 U.S.C. § 1831j(f). Under the WPA,

an employee must prove that his protected disclosure was "a contributing factor" in the

adverse personnel action. 5 U.S.C. § 1221(e)(1). Per the WPA:

> The employee may demonstrate that the disclosure was a contributing factor in the personnel action through circumstantial evidence, such as evidence that -
>
> (A) the official taking the personnel action knew of the disclosure; and
>
> (B) the personnel action occurred within a period of time such that a reasonable person could conclude that the disclosure was a contributing factor in the personnel action.

*Id.* Once a plaintiff establishes a prima facie case, the burden shifts to the defendant to

prove "by clear and convincing evidence that it would have taken the same personnel

action in the absence of such disclosure." 5 U.S.C. § 1221(e)(2); *Hill v. Mr. Money*

*Finance Co.*, 491 F.Supp.2d 725, 731 (N.D. Ohio 2007).

   In 1989, Congress enacted the WPA to amend the Civil Service Reform Act of

1978 ("CSRA"). The CSRA required a plaintiff to prove that his whistleblowing

disclosure was a "significant" or "motivating" factor in his employer's decision to take

-4-

personnel action against him. *Marano v. Dept. of Justice*, 2 F.3d 1137, 1140 (Fed. Cir. 1993). In amending the CSRA, Congress acknowledged that the statute's proof requirements were so exacting that they rendered ineffectual the CSRA's intended protection for whistleblowers. *Id.* Thus, the WPA was specifically enacted to alleviate the high burden on whistleblowing plaintiffs.

To remedy the problem, in the WPA Congress replaced the requirement that the whistleblowing disclosure be a "significant" or "motivating" factor in the personnel decision with the requirement that it merely be "a contributing factor." *Id.* While "a contributing factor" is not further defined by the statute, several courts have appropriated language in the WPA's legislative history terming it, "any factor which alone, or in connection with other factors, tends to effect, in any way, the outcome of the decision." *See Hill*, 491 F.Supp.2d at 731 (N.D. Ohio 2007); *Primes v. Parish Nat. Bank*, 1995 WL 241853 at *5 (E.D. La. 1995); *Rouse v. Farmers State Bank of Jewell, Iowa*, 866 F.Supp. 1191, 1208 (N.D. Iowa 1994); *Haley v. Fiechter*, 953 F.Supp. 1085, 1094 (E.D. Mo. 1997); *Marano*, 2 F.3d at 1140-41 (Fed. Cir. 1993).

Since it will be the very rare case when a plaintiff has overt, smoking-gun evidence proving he was retaliated against specifically for his whistleblowing disclosures, the WPA contains a somewhat inartful section on proof by circumstantial evidence. It provides that a plaintiff "may" prove his disclosure was a contributing factor with circumstantial evidence "such as that": (1) the employer had actual knowledge of the plaintiff's disclosure; and (2) there was temporal proximity, meaning the adverse

personnel action took place "within a period of time such that a reasonable person could conclude that the disclosure was a contributing factor in the personnel action." 5 U.S.C. § 1221(e)(1)(A) and (B). While stated permissively and as an example, courts have made actual knowledge and temporal proximity requirements of the contributory factor element. *See Hill*, 491 F. Supp. 2d at 731; *Rouse*, 866 F. Supp. at 1209.

To summarize, to establish a prima facie case under FIRREA, Plaintiff must prove: (1) that he provided information to a Federal Banking agency regarding either a possible violation of any law or regulation, or gross mismanagement, gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety by the depository institution or any director, officer, or employee of the institution; and (2) that his disclosures were a contributing factor in Defendants' decision to fire him, which may be proved circumstantially by showing that Defendants had actual knowledge of Plaintiff's disclosures and that the decision to fire him was made close enough in time that a reasonable inference can be drawn that it was a contributing factor in Defendants' decision. If Plaintiff satisfies this burden, Defendants may rebut Plaintiff's claim by showing, by clear and convincing evidence, that they would have terminated Plaintiff's employment even without his disclosures to regulators.

## 2. Analysis

### a. Plaintiff's Prima Facie Case under FIRREA

Defendants all but concede that Plaintiff satisfies the first prong. In a footnote to their Motion to Dismiss, Defendants remark that it is "questionable" whether Plaintiff's

reports to local Federal Reserve bank examiners are "sufficient to constitute a report to the Board of Governors of the Federal Reserve System as is required by FIRREA." (Doc. 41 at 14 n. 12). Defendants, however, cite no authority for this proposition, and the Court finds none. FIRREA on its face requires only that Plaintiff report possible violations to "a Federal Banking agency."12 U.S.C. §1831j(a)(1). Plaintiff has unquestionably done so.

Defendants' true object of attack, however, is the second prong. Defendants argue that Plaintiff cannot prove that his disclosures were a contributing factor in their decision to terminate his employment. Defendants note that when considering Plaintiff's termination with HR, Haas never indicated that Plaintiff's repeated complaints about possible violations of the law were a factor in his decision to fire Plaintiff. While Defendants only reference one piece of evidence supporting this assertion - deposition testimony of Nancy Pinckney, a Fifth Third HR employee (Doc. 39 at 40-1) - there are several other documents related to Plaintiff's termination, none of which even mentions Plaintiff's disclosures to bank regulators. (*See* Doc. 44 at Pl. Ex. 13, Pl. Ex. 18, Pl. Ex. 19; Doc. 43 at Ex. 43).

Furthermore, Defendants submit that Plaintiff's disclosures to bank regulators fail the temporal proximity requirement of the contributing factor element. Plaintiff claims he first disclosed that REVG's reporting structure violated Regulation Y in late 2005 or early 2006, and that insufficient staffing levels violated Regulation Y in 2006. (Doc. 36 at 26-30). Therefore, because Plaintiff was only fired in late 2008, Defendants argue that Plaintiff's alleged whistleblowing is too remote in time to be a contributing factor in his

-7-

termination, thus failing to satisfy the requirements for proof by circumstantial evidence under 5 U.S.C. § 1221(e)(1)(A) and (B).

Plaintiff responds that he continued to report these (and other) violations to bank regulators up to the time of his termination in September 2008. (*See* Doc. 36 at 64-6, 76-8; Doc. 37 at 141-42; Doc. 38 at 84-5). Furthermore, the emails that Defendants allege necessitated his firing actually involved Plaintiff's complaints that the Bank continued to violate Regulation Y. Therefore, Plaintiff argues he has met the temporal proximity requirement.

Additionally, while Defendants maintain that Haas never indicated that Plaintiff's disclosures to regulators entered into his termination calculus, Plaintiff argues it is nothing more than a self-serving statement from a co-Defendant. Plaintiff claims in his deposition that at least part of the reason for his firing was "[f]or continuously complaining about the noncompliance the bank was in," and for "speaking out against the bank trying to oppose violations of federal law that they had been cited for by the examiners." (Doc. 37 at 138, 147). Plaintiff posits that the official reason given for his termination was a mere pretext: "their way of terminating me was to come up with some method of doing that." (Doc. 37 at 149).

While it is a very close case, Plaintiff has made a prima facie showing under FIRREA. He disclosed information to Federal Reserve officials regarding the Bank's alleged violations of Regulation Y. Defendants had actual knowledge of these disclosures, and Plaintiff continued to make these disclosures until shortly before his

firing. Therefore, a reasonable person could conclude that Plaintiff's disclosures were a contributing factor - a quite lax standard - in his dismissal. Plaintiff has succeeded in shifting the burden to Defendants.

### b. Defendants' Rebuttal

Defendants argue there is no genuine issue of material fact that they have presented clear and convincing evidence that they would have fired Plaintiff in the absence of his disclosures. Defendants deny that Haas terminated Plaintiff's employment because of his disclosures to bank regulators regarding violations of Regulation Y. Rather, Defendants assert that the evidence is clear that Haas fired Plaintiff because he repeatedly sent intemperate emails, even following a direct warning that such conduct was improper, and attempted to retaliate against his subordinate, White, for forwarding a particularly derogatory email to Plaintiff's superiors. The evidence Defendants marshal is substantial.

On February 27, 2008, a Senior Vice President at Fifth Third's Eastern Michigan Affiliate emailed Plaintiff asking for his assistance in obtaining REVG's response to a pending appraisal request. (Doc. 36 at Ex. 6). In response, Plaintiff complained about receiving the inquiry. He ended his email: "**Gawd you have the most whiny lenders in the world in Michigan!  I thought our's** [sic] **were bad down here:)**". (*Id.* (emphasis in the original)). Shortly thereafter, Plaintiff sent another email, which concluded: "**Some cheese is heading up that way to go with the whine**[.] **It's a stupid subdivision in the worst market in the country!!!  What's the rush to lose more money:)**". (Doc. 36 at

Ex. 7 (emphasis in the original)).  The emails were forwarded to Haas, advising him of Plaintiff's "inappropriate and unprofessional" conduct.  (Doc. 36 at Ex. 7).

Haas contacted HR to discuss how to address Plaintiff's conduct, which Haas alleges had become a pattern.  (Doc. 39 at 11-12).  Though he considered termination,[3] Haas decided to order Plaintiff to undergo corrective counseling.[4]  On March 14, 2008, Haas formally presented the corrective counseling to Plaintiff.  A memo given to Plaintiff outlined his poor behavior, specifically noting the emails, and required Plaintiff to create an action plan to address his problems.  The memo ended, "Any further performance concerns of any nature will lead to further disciplinary action, up to and including termination of employment."  (Doc. 42 at Ex. 8).  Plaintiff met with Lisa Smith, an HR employee, to draw up and complete the plan, and they continued meeting approximately once a month to discuss it.  (Doc. 36 at 107-8).

On Plaintiff's "Executive Performance Review" dated March 26, 2008, Haas gave him a rating of "2- Development Need" for the category "Focuses on the Customer/Client."  Haas commented that Plaintiff "may come off as insensitive or uninvolved when communicating with his internal customers."  (Doc. 38 at Def. Ex. 31).

---

[3] Defendants maintain that Nancy Pinckney, an HR representative, advised Haas that Plaintiff's termination would be appropriate.  They cite two passages from Pinckney's deposition.  In neither does the deponent make such a statement.  In the first, Pinckney states, "I told [Haas] at the time, look, if you want to move him [(Plaintiff)] out . . . frankly, we could support moving him out."  (Doc. 39 at 14).  Similarly, in the second passage, Pinckney says she asked Haas, "why do we want to keep him because if you want to move him out we can."  (Doc. 39 at 26).  These quotations merely show that Pinckney could support firing Plaintiff.  Nowhere does Pinckney state she or anyone else recommended such action.

[4] Defendants assert that at least one other vice president level employee was terminated without counseling for similar behavior.  Defendants cite Pinckney's deposition testimony in support.

Six months after the first email incident there was another. Since his hiring in 2004, Plaintiff alleges he told both his superiors and bank regulators that Fifth Third was violating Regulation Y by allowing the Bank to change the terms of existing real estate loans without first conducting new appraisals of the underlying properties. (Doc. 37 at 147-48; Doc. 38 at 85, Doc. 43 at Ex. 37). During an examination in 2007 or 2008, Federal Reserve officials cited this practice as violating Regulation Y. (Doc. 38 at 85). Fifth Third disagreed and Hubbard, as General Counsel, retained a law firm to draft an opinion letter on this issue, wherein it opined that this practice did not, in fact, violate the regulation. (Doc. 43 at Ex. 37). On Thursday, September 11, 2008, Hubbard emailed the draft letter to Plaintiff's subordinate, Vanessa White, who forwarded it to Plaintiff, Haas, and others. (*Id.*).

Plaintiff responded with a flurry of emails. His first was to White, asking who Hubbard was and why he was emailing the letter to her instead of to Plaintiff. He also chastised her for forwarding the letter to others outside of REVG. (Doc. 43 at Ex. 43).

Plaintiff then emailed Haas, asking why, as Chief Appraiser for Fifth Third, Plaintiff was not included in all Regulation Y issues, suggesting that "a lot of things [related] to Reg Y go on behind my back," and expressing consternation that Fifth Third would try to fight the regulators on this issue. (Doc. 43 at Ex. 40).

Next, Plaintiff emailed Hubbard, asking many of the same questions and making many of the same points. The email closed, "This is a damaging path the bank is taking. Regulators have final say and can require us to do more than Reg[ulation] Y requires.

-11-

They did this to Huntington Bank recently and [it] resulted in a lot of new staff having to

be hired." (Doc. 43 at Ex. 41).

After receiving an email from Haas asking him to call and discuss the matter,

Plaintiff responded by email saying he would call when he "calmed down a bit," and

expressing his displeasure with White and Hubbard for "doing this behind my back."

(Doc. 43 at Ex. 40).

Subsequently, Plaintiff emailed White again with what the Defendants have

colorfully termed the "Stupid Dumb Idiot" email:

> I have emailed [Hubbard] and told him what I think of the
> stupid move to get a dumb boston [sic] firm involved. Total
> idiot. The damage this can do [is] extreme. But I guess that
> would be well deserved for this bank. This has to be the
> dumbest bank move in history. I hope we get a
> C[ease]andD[esist letter] now. Fools[.]"

(Doc. 43 at Ex. 43). White forwarded the email to Hubbard, who forwarded it to Haas,

who shared it with representatives in HR. (*Id*.).

Later that same night, Plaintiff sent all of the recipients of the initial email from

White his substantive objections to the opinion letter. (Doc. 43 at Ex. 44).

Soon after, Plaintiff sent an email to White only expressing his frustration with her

performance, specifically her inability to follow his instructions. (Doc. 43 at Ex. 45).

White responded with confusion. The next day, Friday, September 12, 2008, Plaintiff

replied by listing some of her recent mistakes and shortcomings, including her emailing

the draft letter without conferring with him first. It closed: "I can go on [about] prior

-12-

weeks if I cared to but I don't. H.R. [c]an be involved but I would prefer you considered leaving either way. I do not see this working out to any kind of tolerable level. The disrespect has gotten extreme and crossed the line of being acceptable." (*Id.*).

Plaintiff left two messages with Smith from HR about firing White, relating that he had already emailed White his feelings on the matter. (Doc. 43 at Ex. 46). In an email, Smith informed Plaintiff that telling White he wanted her to leave was inappropriate. (Doc. 43 at Ex. 48).

On Tuesday, September 16, 2008, Plaintiff met with HR representative Smith and Kris Sammons. They informed Plaintiff of the inappropriate tone and language of his emails regarding Regulation Y and the impropriety of his emails to White stating that she should leave the Bank. The emails were particularly egregious, the HR reps said, because Plaintiff was recently given corrective counseling for the same type of behavior. (Doc. 43 at Ex. 55). This was apparently the first time Plaintiff was informed that White forwarded his "Stupid Dumb Idiot" email to Hubbard. (Doc. 43 at Ex. 50). The HR representatives also related that they believed his actions toward White may be in retaliation for her tattling on him to Hubbard. (*Id.*).

After the meeting, Plaintiff drafted a lengthy, detailed email to Smith setting forth his many "issues" with White and his reasons supporting her termination. (Doc. 43 at Ex. 51). On Friday, September 19, 2008, Plaintiff drafted another email entitled, "Chronology of events that helps with the retaliation concern," wherein he explained his many problems with White and that he sought her termination before he knew that she

-13-

had sent his derogatory email to Hubbard. (Doc. 43 at Ex. 50). Plaintiff continued to email HR regarding White's foibles and his desire to see her employment ended. (Doc. 43 at Ex. 53, Ex. 54, Ex. 56).

On Monday, September 22, 2008, Haas informed Plaintiff he was fired. (Doc. 37 at 194). A memo outlines the reasons for his firing, as do Haas' notes of the meeting. (Doc. 44 at Pl. Ex. 18; Doc. 43 at Ex. 60). Haas wrote that he discussed Plaintiff's communications and collaboration deficiencies in the past and that the "Stupid Dumb Idiot" was unprofessional, disrespectful, and would not be tolerated. (Doc. 43 at Ex. 60). In his deposition, Haas testified that Plaintiff's alleged retaliation against White was also a reason for his firing. (Doc. 38 at 113-14). The memo is much the same. (Doc. 44 at Pl. Ex. 18).

Defendants put forth significant evidence that Plaintiff was fired for repeatedly sending intemperate emails to his fellow Fifth Third employees. He was given a warning and corrective counseling when his belittling emails first came to light. Six months later, he was fired after sending similar name-calling missives.

The allegations of retaliation against White are more problematic. The time-line of events reveals that Plaintiff expressed his intention to have White fired several days before he was aware that White had forwarded his infamous "Stupid Dumb Idiot" email to its subject, Hubbard. It appears highly unlikely, then, that Plaintiff sought her termination as payback. This seems of particular import in light of Plaintiff's position that he was actually fired in retaliation for his continued disclosures to regulators and his

-14-

persistent efforts to rectify violations internally, and that Defendants' given reasons are a facade.

Nonetheless, Defendants' evidence is overwhelming that they would have fired Plaintiff for his repeated inappropriate emails even in the absence of his disclosures to regulators. Other than speculation on Plaintiff's part, there is simply no evidence that Plaintiff was fired for any reason other than those proffered by Defendants. Plaintiff was never counseled to stop disclosing information to regulators and was in fact lauded for his close relationship with them. (Doc. 36 at Ex. 21). He was told in unequivocal terms that if he sent another inappropriately toned or worded email that he would be subject to termination. Plaintiff was given this warning after he sent an email that was unrelated to his disclosure of alleged violations to regulators, giving credence to Defendants claim that the substance of the emails were irrelevant and that the cynical tone and belittling language were the problem. Plaintiffs argument that Defendants' reasoning is a pretextual veneer is wholly unsubstantiated, as he has presented no evidence other than his own, speculative deposition testimony. In short, there is no genuine issue of material fact whether Defendants have proved by clear and convincing evidence that they would have terminated Plaintiff in absence of his disclosures the Federal Reserve officials. Therefore, summary judgment is granted on Plaintiff's claim for retaliation under FIRREA.[5]

---

[5] *See Cosgrove v. Federal Home Loan Bank of New York*, 1999 WL 163218 at *12 (S.D.N.Y. 1999) (FIRREA case decided on summary judgment where defendant had clearly and convincingly evidenced that it would have fired plaintiff anyway, absent any protected disclosures).

**B.    Plaintiff's claim for retaliation under Sarbanes Oxley**

**1.    Elements**

Much like FIRREA, SOX creates a private right of action for employees of

publicly-traded companies who are retaliated against for disclosing information about

potentially unlawful conduct.  The statute states, in pertinent part,

> (a) No [publicly-traded company], or any officer, employee
> . . . of such company . . . may discharge, demote, suspend,
> threaten, harass, or in any other manner discriminate against
> an employee in the terms and conditions of employment
> because of any lawful act done by the employee–
>
> (1) to provide information, cause information to be provided,
> or otherwise assist in an investigation regarding any conduct
> which the employee reasonably believes constitutes a
> violation of [18 U.S.C.] section 1341 [(mail fraud)], 1343
> [(wire fraud)], 1344 [(bank fraud)], or 1348 [(securities
> fraud)], any rule or regulation of the Securities and Exchange
> Commission, or any provision of Federal law relating to fraud
> against shareholders, when the information or assistance is
> provided to or the investigation is conducted by–
>
> (A) a federal regulatory or law enforcement agency;
>
> (C) a person with supervisory authority over the employee (or
> such other person working for the employer who has the
> authority to investigate, discover, or terminate misconduct).
>
> (b)Enforcement Action
>
> (1) A person who alleges discharge or other discrimination by
> any person in violation of subsection (a) may seek relief under
> subsection (c) [(Remedies)], by -

> (A) filing a complaint with the Secretary of Labor; or
>
> (B) if the Secretary has not issued a final decision within 180 days of the filing of the complaint and there is no showing that such delay is due to the bad faith of the claimant, bringing an action at law or equity for de novo review in the appropriate district court of the United States, which shall have jurisdiction over such an action without regard to the amount in controversy.

18 U.S.C. § 1514A

The burdens of proof in SOX retaliation actions are imported from 49 U.S.C. § 42121. 18 U.S.C. § 1514A(b)(2)(C). To prevail, an employee must prove by the preponderance of the evidence[6] that: (1) he engaged in protected activity; (2) his employer knew that he engaged in the protected activity; (3) he suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action. *Allen v. Admin. Review Bd.*, 514 F.3d 468, 475-76 (5th Cir. 2008); *Gale v. U.S. Dep. of Labor*, 384 Fed. Appx. 926, 929 (11th Cir. 2010); 29 C.F.R. § 1980.104(b)(1)(i)-(iv).

If an employee presents a prima facie case, the burden then shifts to the employer to prove "by clear and convincing evidence that the employer would have taken the same unfavorable personnel action in the absence of that [protected] behavior." 49 U.S.C. § 42121(b)(2)(B)(iv).

---

[6] Under 49 U.S.C. § 42121(b)(2)(B)(iii), an employee is entitled to relief "only if the [employee] demonstrates that [the protected activity] was a contributing factor in the unfavorable personnel action alleged in the complaint." Courts have consistently held that the term "demonstrates" in this context means proof by a preponderance of the evidence. *See Dysert v. Sec'y of Labor*, 105 F.3d 607, 610 (11th Cir. 1997) (addressing an analogous statutory burden shifting framework under the Energy Reorganization Act of 1974); *Allen* at 475, fn. 1.

Defendants submit that Plaintiff cannot establish a prima facie case because he cannot prove either the first or fourth elements. Even if Plaintiff could, Defendants argue that summary judgment is appropriate nevertheless, because clear and convincing evidence shows they would have fired Plaintiff irrespective of his whistleblowing.

### 2.   Analysis

#### a.   First Element - "Protected Activity"

To constitute "protected activity" under the first element, a plaintiff must "reasonably believe[]" that the information he provided constitutes a violation of one of the six categories of laws cited in 18 U.S.C. § 1514A(a)(1). Though the Sixth Circuit has yet to define "reasonably believes" in this context, all circuit courts that have done so agree there is both a subjective and an objective component. *See Day v. Staples, Inc.*, 555 F.3d 42, 54 (1st Cir. 2009); *Welch v. Chao*, 536 F.3d 269, 275 (4th Cir. 2008); *Allen*, 514 F.3d at 477 (5th Cir. 2008); *Harp v. Charter Comm., Inc.*, 558 F.3d 722, 723 (7th Cir. 2009); *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 1000 (9th Cir. 2009); *Gale*, 384 Fed. Appx. at 929 (11th Cir. 2010). Though reasonable belief is required, because SOX is intended to foster a corporate culture that encourages internal vigilance against corporate wrongdoing, a plaintiff need not show an actual violation or quote a code section he believes was contravened. *Fraser v. Fiduciary Trust Co. Intern.*, 417 F.Supp.2d 310, 322 (S.D.N.Y. 2006). The employee must, however, identify the specific conduct that he believes is illegal, as general inquiries do not constitute protected activity. *Welch*, 536 F.3d at 276-77. Further, because SOX only protects certain disclosures, a plaintiff must

-18-

prove that the cited conduct "definitively and specifically" relates to one of the classes of laws listed in 18 U.S.C. § 1514A(a)(1). *Id.*[7]

### i. "Definitively and Specifically"

Defendants argue that Plaintiff's complaints did not "definitively and specifically" relate to one of the enumerated laws covered by SOX. (Doc. 41 at 18). Plaintiff responds that he complained to his superiors and the Federal Reserve regulators about potential violations of Regulation Y due to the defective reporting structure of REVG, inadequate staffing in REVG, the improper practice of closing loans before appraisals are obtained, the inappropriate ordering of appraisals by lenders, and the misguided use of evaluations to extend credits rather than requiring appraisals. (Doc. 54 at 14-5). He asserts that he reasonably believed these complaints definitively and specifically related to fraud against shareholders. (*Id.* at 15).

In his deposition, Plaintiff explained:

> By influencing the appraisal department and giving it inadequate resources to perform its job in a way to protect shareholders by helping the best it can to ensure the quality of loans are made with quality information, they result in large loan losses, which have been experienced. It's not totally, but it certainly is a contributor. And therefore, it's defrauding the shareholders. It is also defrauding them by stating in the annual report that they knowingly do not know of any non-

---

[7] This requirement, first annunciated by the Department of Labor's Administrative Review Board in *Platone v. FLYi, Inc.*, 25 IER Cases 278, 287 (U.S. Dept. of Labor, Sept. 29, 2006), has been uniformly followed, including by the First, Fourth, and Fifth Circuits, as well as the District Court for the Southern District of New York, among others. *Day*, 555 F.3d at 55 (1st Cir. 2009); *Welch v. Chao*, 536 F.3d at 275 (4th Cir. 2008); *Allen*, 514 F.3d at 476 (5th Cir. 2008); *Sharkey v. J.P. Morgan Chase & Co.*, 2011 WL 135026 (S.D.N.Y. 2011).

> compliance issues, and therefore misleading to the
> shareholders in that regard.
>
> So when you're causing loan losses and you're causing
> earnings to get hurt, and you're causing share value to go
> down, you're as I understand it, defrauding shareholders.

(Doc. 36 at 68-9). Plaintiff reasonably believed that the violations he disclosed

definitively and specifically related to fraud against shareholders. Though far from a

precise definition of shareholder fraud, Plaintiff is not required to be a legal expert to

receive SOX whistleblower protection. His testimony on this point is sufficient.[8]

### ii.    Reasonably Believes

Defendants maintains that Plaintiff's belief that Fifth Third was violating securities

laws and defrauding shareholders is not reasonable and therefore that his actions are not

protected activity. Defendants argue that the Federal Reserve regulators' response, or

lack thereof, to Plaintiff's disclosures demonstrates that his belief that Defendants were

defrauding shareholders is not objectively reasonable.

As stated, there is both a subjective and an objective element to reasonable belief.

The Fourth Circuit has explained the objective component as requiring a plaintiff show

that "a reasonable person in his position would have believed that the conduct constituted

a violation." *Livingston v. Wyeth, Inc.*, 520 F.3d 344, 352 (4th Cir. 2008). The Fifth

---

[8] In his Memo in Opp., Plaintiff did not claim that his allegations definitively and specifically related
to securities fraud and/or SEC rules and regulations, despite allegations in his deposition that Defendants
violated public disclosure rules. Plaintiff testified that the statement in Fifth Third's annual report that it
did not know of any compliance issues was misleading. However, because Plaintiff did not present this
argument, the Court will not consider it. In addition, Plaintiff asserted his disclosures related to bank
fraud. Plaintiff does not explain his reasoning and it is entirely unclear how violations of Regulation Y
amount to a scheme to defraud a bank.

Circuit and Seventh Circuit stated it thusly: "The objective reasonableness of a belief is evaluated based on the knowledge available to a reasonable person in the same factual circumstances with the same training and experience as the aggrieved employee." *Allen*, 514 F.3d at 477 (5th Cir. 2008) (cited in *Harp*, 558 F.3d at 723 (7th Cir. 2009)).

Furthermore, courts have required some showing of scienter when a plaintiff asserts that he reported potential shareholder fraud, the catch-all category in 18 U.S.C. § 1514A(a)(1). *Allen*, 514 F.3d at 479-80. In *Allen*, the Fifth Circuit required "that the employee must reasonably believe that his or her employer acted with a mental state embracing intent to deceive, manipulate, or defraud its shareholders." *Id*. at 480. The court noted, though, that "an employee's reasonable but mistaken belief that the employer violated some provision of Federal law relating to fraud against the shareholders is protected." *Id*. (quotations excluded). The First and Ninth Circuits have explained the requirement in slightly different terms. According to the First Circuit, "To have an objectively reasonable belief there has been shareholder fraud, the complaining employee's theory of such fraud must at least approximate the basic elements of a claim of securities fraud." *Day*, 555 F.3d at 55 (cited in *Van Asdale*, 577 F.3d at 1001 (9th Cir. 2009). Securities fraud typically requires proof of a material misrepresentation or omission, scienter, loss, and a causal connection between the misrepresentation or omission and the loss. *Id*. at 56. Thus, the First Circuit held that a plaintiff "need not reference a specific statute, or prove actual harm, but he must have an objectively

-21-

reasonable belief that the company intentionally misrepresented or omitted certain facts to investors, which were material and which risked loss." *Id*.

Defendants maintains Plaintiff's belief that Defendants were committing shareholder fraud is not objectively reasonable because there is no evidence that Defendants intended to deceive or defraud shareholders, or misrepresented or omitted material facts to them, by its conduct related to REVG and Regulation Y. Most enlightening is the Federal Reserve regulators' response to this conduct. When the regulators questioned REVG's reporting structure, Defendants altered it and the regulators did not require further changes. (Doc. 36 at 64-5). When the regulators inquired about staff reductions, Defendants explained the reasoning behind themand the regulators never commented further. (*Id*. at 80-2). Plaintiff also testified that he reported all other violations of Regulation Y to Federal Reserve regulators, yet there is no evidence that the regulators ever considered Fifth Third out of compliance. (*Id*. at 29-32).

Though Plaintiff obviously subjectively believes he reported actions that constituted shareholder fraud, the fact that the Federal Reserve regulators did not appear to consider them violations militates against finding that belief objectively reasonable. While Plaintiff testified in his deposition that regulators will often allow banks to be out of compliance and in violation of federal banking laws (*Id*. at 32), there is simply no evidence that regulators viewed this conduct as non-compliance. Moreover, Plaintiff has put forth no evidence that Defendants engaged in such conduct with an intent to deceive shareholders. In each case, bank regulators were aware of Plaintiff's complaints yet did

not appear to consider them violations. In such an instance, no reasonable person could believe Defendants were defrauding shareholders by not disclosing such information.

In conclusion, a reasonable person in Plaintiff's position would not believe that these actions constituted shareholder fraud. Therefore, Plaintiff's alleged whistleblowing was not protected activity under SOX, and Plaintiff cannot present a prima facie case for retaliation. Summary judgment is granted to Defendants on Plaintiff's claim for retaliation under SOX.[9]

### C. Plaintiff's Claim For Wrongful Discharge in Violation of Public Policy

Plaintiff's third and final cause of action is a state tort claim for wrongful discharge in violation of Ohio public policy. Such an action was created by Ohio courts that carved out several exceptions to the general rule of at will employment, the common law doctrine that permits an employment relationship to be terminated by either side at any time and for any reason.

To prevail on a claim for wrongful discharge in violation of public policy, a plaintiff must prove four elements: (1) clarity: "[t]hat clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law;" (2) jeopardy: "[t]hat dismissing employees under circumstances like those

---

[9] Even if Plaintiff could establish a prima facie case for SOX retaliation, Defendants would nonetheless garner summary judgment after the burden shifted. For the same reasons summary judgment is granted on Plaintiff's FIRREA retaliation claim, Defendants have shown by clear and convincing evidence that they would have terminated Plaintiff's employment regardless of his allegedly protected activity. See *Harp v. Charter Communications, Inc.*, 558 F.3d 722, 726-27 (7th Cir. 2009) (SOX case affirming summary judgment to the employer where it showed by clear and convincing evidence that it would have terminated the plaintiff even in the absence of her alleged protected conduct).

involved in the plaintiff's dismissal would jeopardize the public policy;" (3) causation: "[t]he plaintiff's dismissal was motivated by conduct related to the public policy;" and (4) overriding justification: "[t]he employer lacked overriding legitimate business justification for the dismissal." *Leininger v. Pioneer Natl. Latex*, 115 Ohio St.3d 311, 313 (2007) (internal quotations omitted). Critically, in *Leininger*, the Ohio Supreme Court held, "when a statutory scheme contains a full array of remedies, the underlying public policy will not be jeopardized if a common-law claim for wrongful discharge is not recognized based on that policy." *Id*. at 317.

As to the first element, Plaintiff rests his claim on the putative Ohio public policy, "that banks must ensure the independence, effective use and integrity of their appraisal activities in order to prevent fraudulent or poor lending practices injurious to its shareholders, the economy, citizenry and taxpayers." (Doc. 1 in case number 1:09-cv-476). He fails, however, to cite from where this putative public policy derives, much less to explain how it is clearly exists.

Regarding the second element, Defendants argue that even if there is such a policy, it is fully vindicated by both FIRREA and SOX, both of which provide a full panoply of remedies if someone is fired for reporting such violations. Therefore, the policy will not be jeopardized if Plaintiff cannot sue in tort for wrongful discharge based on this alleged policy.

As to the third element, as previously shown, Plaintiff's firing was not motivated by conduct related to the supposed public policy concerning appraisal independence and

efficacy. Rather, he was terminated for repeatedly sending intemperate emails even after he was specifically warned that doing so could lead to his firing.

Finally, regarding the fourth element, for the reasons just stated, Defendants have demonstrated an overriding legitimate business justification for Plaintiff's firing.

Plaintiff has failed to establish a single element of a claim for wrongful discharge for violation of public policy. Consequently, there is no genuine issue of material fact and Defendants' motion for summary judgment is granted on this claim as well.

## IV. CONCLUSION

Accordingly, for the reasons stated herein, Defendants' motion for summary judgment (Doc. 41) is **GRANTED**. Defendants are entitled to:

1. Summary judgment on Plaintiff's FIRREA retaliation claim (Count I of Doc. 1 in case number 1:09-cv-14);

2. Summary judgment on Plaintiff's SOX retaliation claim (Count I of Doc. 1 in case number 1:09-cv-476);

3. Summary judgment on Plaintiff's wrongful discharge in violation of public policy claim (Count II of both Doc. 1 in case number 1:09-cv-14 and Doc. 1 in case number 1:09-cv-476);

Accordingly, all claims of Plaintiff having been denied, the Court shall forthwith, by separate entry, enter judgment against Plaintiff on all claims, thereby terminating this case from the docket.

**IT IS SO ORDERED.**

Date: 4/25/11

Timothy S. Black
United States District Judge